PEOPLES NATIONAL BANK OF WAUKON, Appellee, v. FRANK
RUSSEL et al., Appellees; CITIZENS STATE BANK OF
WAUKON, Appellant.

PLEADING:  Amendments—Unreasonable and Unexplained Delay.
1  The court may very properly reject an amendment when it is with-
held until the close of the testimony, and when it appears that the
pleader had knowledge, from the early stages of the pleading, of
the alleged facts upon which to base the plea.

EQUITY:  Hearing—Testimony Under Stricken Pleading.  In equity,
2  a party who has his amendment stricken should proceed to offer
his testimony in support of the amendment, in order that he
may have the benefit of the amendment in case the ruling striking
the pleading is reversed on appeal.

*Appeal from Allamakee District Court.*—H. E. TAYLOR, Judge.

JUNE 22, 1923.

REHEARING DENIED SEPTEMBER 22, 1923.

SUIT in equity, for the foreclosure of a chattel mortgage.
Defendant Russel was the mortgagor; defendant Bender was a
purchaser of the property, who assumed the chattel mortgage
thereon; the defendant Citizens State Bank is charged with the
conversion of the mortgaged property; the defendant Niehaus
was president of the defendant Citizens State Bank, and was
its active agent in whatever was done.   There was a decree of
foreclosure and judgment for substantially the full amount of
the debt, as against Russel and Bender, and a judgment for
$653 against the Citizens State Bank.   The defendant Citizens
State Bank first appealed, and is known in the record as the
appellant.   Subsequent appeals were taken by Russel, Bender,
and plaintiff, Peoples National Bank.—*Modified and affirmed
on plaintiff's appeal; reversed on defendant bank's appeal.*

   *Dayton & Eaton* and *Trewin, Simmons & Trewin,* for ap-
pellant.

   *William S. Hart* and *A. E. Sheridan,* for appellees.

Evans, J.—I. The principal controversy presented to us is between the two banks, plaintiff and defendant, and we shall deal first with their respective appeals. On January 12, 1918, defendant Russel and wife executed a chattel mortgage to the plaintiff bank for $2,500, which included, among other property, certain cattle, described in the mortgage as follows:

"Seven red cows, one black cow, five red heifers coming three years old, two red heifers coming one year old, four red calves, eight Holstein cows with all increase."

The property was described as being in the possession of the mortgagor, upon a certain farm occupied by him. This farm is known in the record as the Eckhart farm, and had been recently purchased by executory contract by Russel from Eckhart. The cattle above described constituted, in fact, all the cattle owned by Russel upon this farm at the time of the execution of the mortgage, though this fact was not stated in the mortgage. On March 4, 1918, Bender purchased the Eckhart farm from Russel by taking an assignment of his contract. By his contract of purchase with Russel, Bender purchased also all the personal property of Russel then upon the farm, and assumed certain indebtedness of Russel's, including the $2,500 mortgage. The plaintiff put its chattel mortgage of record on March 5th. Bender went immediately into possession of the Eckhart farm and the personal property thereon, pursuant to his contract of March 4th.

On January 12, 1918, Bender had executed a mortgage to the defendant bank or one of its officers for $4,500. The description of the mortgaged property included the following: "Thirty-six cows, three steers, two heifers, two bulls and twelve calves, also increase and additions by birth or purchase."

This property was described as being in the possession of the mortgagor upon his certain described farms. After the purchase and occupancy of the Eckhart farm by Bender, he moved thereto the major part of the cows owned by him upon the other farms. On May 8, 1918, Bender executed a chattel mortgage to the defendant bank for $1,170, being the purported purchase price of the mortgaged property. Said mortgage included in its description the following:

"Nine Durham cows and all increase and five milch cows

and all increase owned by us and kept on above described land."

The described land was the Eckhart farm. On April 2, 1919, Bender held a public sale, which had been duly advertised, wherein he sold substantially all his personal property located on the Eckhart farm. Niehaus was clerk of the sale. Substantially all the proceeds of the sale were turned over to him as the property of the defendant bank, to apply upon the two chattel mortgages. It was the claim of the plaintiff bank that the property sold at this sale included the property covered by its mortgage, or at least a part of such property, and that the activities of Niehaus in relation to such sale were such as to charge him and the defendant bank with liability as for conversion of the mortgaged property. It was on this theory that the trial court entered judgment against defendant bank for $653. The record does not disclose what specific facts were deemed established by the court as a basis for such judgment. The implication is that the court found that some of the property included in plaintiff's mortgage was disposed of at the sale, and that the defendant bank was liable for the value thereof as for conversion. We are advised by the brief of appellee that the court awarded the estimated value of the "seven red cows" which were covered by plaintiff's mortgage. This is as plausible an explanation of the court's finding as can be made, upon the record. The first question for our consideration, therefore, is whether the evidence in the record sustains the judgment. Bender was a young Napoleon of finance whose meteoric career began upon the date of the death of his mother on October 26, 1917, and ended with his public sale on April 2, 1919. By the death of his mother, he inherited a half interest in the home farm, upon which he had previously been a renter. Immediately upon that event, he started upon a very active business career, which consisted mostly in buying and selling cattle and in buying farms. During that period, he had bought three farms and paid for none of them, and an unestimated number of cows and other cattle. He did his banking business solely with the defendant bank. During that period, he transacted a business whose footings amount to approximately $50,000, and at its close was indebted to the defendant bank in a balance of approximately $9,000. Whatever case the plaintiff bank has

against the defendant bank rests solely upon the testimony of Bender. He testified in the first instance that the seven red cows bought by him from Russel were on the place at the time of the public sale, and included therein. It developed upon his cross-examination that he was wholly without knowledge as to whether any of the cattle included in the plaintiff's mortgage were still on the farm at the time of the sale. It appears without dispute that, after the execution of the chattel mortgage by Russel, he subsequently bought and brought upon the place ten or twelve other cows, mostly red, and that all these were upon the place at the time of Bender's purchase, and were included in his purchase. Bender assumed the chattel mortgage; but of the cows purchased by him from Russel, he never knew which were included in the mortgage and which were not. In view of his having assumed the mortgage, he doubtless deemed it immaterial to differentiate as between those included in the mortgage and those not included therein. The only person used as a witness who might have testified with knowledge on the subject was Russel. No attempt was made to prove identification by Russel. The following excerpts from Bender's cross-examination will be a sufficient indication of the utter want of knowledge on the part of Bender as to the particular identity of the cows included in the sale:

"Russel bought cows and took onto the Eckhart place, but I do not know how many. There were more than ten or a dozen. Russel bought cows after he went onto the Eckhart place, and brought them there. There were somewhere around between 15 and 20 that I got when I took the Eckhart place. * * * I could not give you a description of the cattle that I had, either on the Shehonick or the Eckhart place, that I took with me. I could not go out in the country and locate the cattle. If I should see those cows that were sold at the sale scattered around the country in different herds, I could not identify them now. I sold about $1,000 worth of stock to Fred Myers, over to Postville, but I could not say how much I got in checks. I sold it off the Eckhart place. That was the young stock that was on the place when I went there. I owned quite a number of cows during 1917 and 1918, but I could not tell you how many. I advertised 29 cows in that sale. * * * I could not take the report

of the sale and identify any of the cows that were sold at all. I know of no way in which anybody can tell which cows were in the $2,500 mortgage. These cows ranged in price from $125 down to $67, and nobody can find out which of these cows were in the $2,500 mortgage to Stock. The Holstein cows were not on the farm when the third sale took place, April 2, 1919. I traded six of them to Smith Brothers in exchange for other cattle, and the other one I traded for a black mare that I sold to Ed Ewing. * * * I had 36 cows: 10 were sold to Taylor, 10 to Barr, 7 to Swenson,—that left 9. I do not know how many of the others died. I lost a couple during that time. I sold Frank Russel 6 of the cows at one time. They are included in the 36. * * * I moved the stuff up to the Eckhart place, both from the home farm and from the Shehonick place. I could not say how many cows I changed up to the Eckhart place. I know I had some there. I had 10 or 12 cows on the home place,— maybe more. These were the ordinary kind of cattle,—short-horns. I moved some young stock from the old place up on the Eckhart place,—heifers, steers, cows,—15 or 20 head. I moved 25 or 30 head altogether up there. I brought there a lot of red cows, a dozen or 15. The cows all ran together. Russel had on the place other stuff besides what he got from Eckhart. He had some other cattle besides those in the mortgage while he was on the Eckhart place. Some were cows and some were steers,—3 or 4 red cows that I know of. The cows I bought from Arnold were put on the Eckhart place. They were called Durham. I had sold some cows off the Eckhart place before I bought the Arnold cows.''

We feel compelled to hold, therefore, that, in the light of Bender's cross-examination, his direct evidence that the ''seven red cows at least'' were sold at the sale was a mere conclusion on his part, and was based upon no definite knowledge whatever. In view of our conclusion on this question of fact, we have no occasion to consider questions argued as to the sufficiency of the description in the mortgage, or whether the activities of Niehaus in relation to the sale were such as to subject him to liability for conversion.

II. We turn now to the appeal of the plaintiff bank. This appeal is directed in the main to a question of practice. At the

close of the evidence, the plaintiff filed an amended petition,

1. PLEADING: amendments: unreasonable and unexplained delay. purporting to conform to the evidence. Upon motion of the defendant bank, this petition was stricken. This amendment averred, not that the defendant bank had converted the mortgaged property, but that it had assumed and agreed to pay its mortgage, and that such promise to pay was made by the defendant bank to the defendant Bender. The trial court held that the amendment was filed too late, in that it wholly changed the issues, and, in effect, that no sufficient excuse was shown for the delay in filing. No substantial excuse was disclosed by the plaintiff. It did contend that it had not known of these facts until they were testified to by Bender on the trial. But Bender was hostile to the defendants, and, in effect, joined with the plaintiff in all its allegations. He pleaded as his defense the very alleged agreement on the part of the defendant bank which the plaintiff bank set up in its amended petition. Bender's evidence added nothing of information that was not contained in the specific allegations of his defense. It is not claimed that the defendant bank had ever promised the plaintiff to pay its mortgage. The promise relied on by the plaintiff is that alleged to have been made to Bender. The cause of action pleaded in the amended petition was clearly inconsistent with the claim of conversion. We are clear that the trial court acted within its proper discretion in refusing the amendment.

We have to say, also, that the only evidence in the record to sustain such claim on the part of plaintiff is that of Bender, and that it is very unsatisfactory and quite incredible. If the

2. EQUITY: hearing: testimony under stricken pleading. trial court had permitted the amendment to stand, we do not think it would have been justified in finding such alleged cause of action proved by the testimony in the record. To meet this latter point, it is contended by the plaintiff bank that it had other evidence to offer which would have completed the proof. If that be so, then it was not filing an amendment only to conform to the evidence, but was really and consciously changing the issues. The plaintiff did not, in fact, offer any additional evidence. Its excuse for that is that it was prevented from so doing by the ruling of the court in striking the pleading. We do not think

that the ruling of the court in striking the pleading had the necessary effect of preventing the offer of evidence. The plaintiff takes the position that it is entitled to a reversal on error because of the action of the court in striking its amendment, and that, upon reversal, the cause should be remanded for a new trial. Needless to say, this would work a very radical departure from the usual appellate practice in equity cases. We are clear that the plaintiff is not entitled to it.

This disposes of the principal appeals. Our conclusion thereon is fatal to any claim made by the appellants Russel and Bender. Such conclusion, however, renders it necessary to modify the decree in plaintiff's favor, as against Russel and Bender. In awarding judgments in favor of plaintiff against Russel and against Bender, the court diminished the amount of such judgment by $653, on the theory, doubtless, that, if the plaintiff collected that amount from the defendant bank, it should not collect it a second time from the other defendants. Inasmuch as plaintiff's judgment against the defendant bank must be reversed, plaintiff is clearly entitled to a judgment for the full amount of its debt, for which Bender shall be made primarily liable and Russel secondarily so.

For the reasons herein indicated, the judgment of the plaintiff bank against the defendant bank is reversed, on the appeal of the defendant bank. The decree on the appeal of the plaintiff bank against the defendant bank is affirmed. The decree in favor of the plaintiff as against defendants Russel and Bender is modified, as above indicated.—*Modified and affirmed* on plaintiff's appeal; *reversed* on defendant bank's appeal.

PRESTON, C. J., ARTHUR and FAVILLE, JJ., concur.