W. O. COLLINS, doing business under the trade name of the GUS
PECH FOUNDRY & MANUFACTURING COMPANY, Appellee,
v. E. G. GARD et al., Appellants.

No. 43972.

OCTOBER 19, 1937.

Meltzer & Vogl, for appellee.

E. O. Bundy and C. M. Gasser, for appellants.

STIGER, J.—On June 27, 1935, plaintiff and the defendant,
E. G. Gard, entered into a written contract for the drilling of a
well on the defendant's farm. The material provisions of the
contract are as follows:

"Par. 2. The diameter of the said well shall be 4 inches all the way to the depth of the well.

"Par. 4. First party guarantees an ample supply of water for general farm and stock raising purposes and guarantees the efficiency of said well for one year from date of completion.

"Par. 6. The second party agrees to pay to the first party for the work and material furnished for drilling said well—at the following schedule price as listed below:

$1.25 per foot for the first 100 feet.
$1.75 per foot from 100 to 200 feet.
$2.25 per foot from 200 to 300 feet.
$2.75 per foot from 300 to 400 feet.
$3.25 per foot from 400 to 500 feet.

And this raise of fifty cents per foot every 100 feet shall continue to the depth of the well.

"Par. 8. Second party to furnish board and lodging for two men while on the job. Also a small amount of water for drilling purposes.

"Par. 9. In the event it is found that a screen is necessary to properly finish said well, then it must be furnished according to the specifications desired by said driller. The said screen is not included in the above price and is an additional charge."

Plaintiff commenced drilling the latter part of June using a 4-inch casing. At 182 feet, the parties thought an adequate supply of water had been found. The defendant furnished the pump and pump line which was installed by the plaintiff. In September, the defendant notified the plaintiff that the well did not furnish a satisfactory amount of water and in October plaintiff returned to the defendant's farm and drilled to a depth of 394 feet using a three inch casing for the extended depth. At this depth water was found which immediately rose 180 feet and, so far as shown by the record, there has not been less than 180 feet in the well since it was completed in November, 1935, at the extended depth. On test the well furnished about two gallons per minute. At the time of the trial there were about 7 feet of sand in the bottom of the casing.

The well was satisfactory to the defendant from the time it was completed in November, 1935, until May, 1936, at which time this action was pending, having been commenced in March, 1936. In May, 1936, the defendant complained to plaintiff about

the well and plaintiff pulled the pump and found the leathers in the plunger were worn out. New valve leathers were installed and plaintiff claims no further objection was made by defendant.

Defendant claims that in September, 1936, the pump began again to fail and then went completely dry.

In November, 1935, after the well was completed, defendant tendered plaintiff a check for drilling 182 feet claiming that he was not obligated to pay the plaintiff for drilling the extended depth of 212 feet because the plaintiff deepened the well under his guaranty.

In March, 1936, the plaintiff brought this action asking judgment against the defendant for $753.68, which was the compensation provided by the contract for a well 394 feet in depth, less certain credits due defendant, and for the foreclosure of his mechanic's lien. Plaintiff made the written contract a part of his petition and alleged full performance under the contract on his part.

Defendant filed a general denial and further answered, stating that:

"They specifically deny that any contract was entered into to reduce the size of the diameter of the well from a 4-inch to a 3-inch pipe. The plaintiff proceeded to change the plan of said well without the consent or agreement upon the part of the defendants. Defendants specifically deny that plaintiff has complied with said contract and state that the plaintiff has failed to comply with the terms of said contract."

The trial court found for the plaintiff and on October 1, 1936, a decree was entered rendering judgment against the defendant as prayed in plaintiff's petition.

Defendant claims that when plaintiff brought his equipment back to the farm in October, 1935, to drill a deeper well, it was for the purpose of making good his guaranty of an ample supply of water for one year from date of completion of the well, and that no charge was contemplated by the parties for drilling by the plaintiff beyond the original 182 feet. The defendant states in his brief and argument; "never could either party have contemplated going down over 200 feet further. Unquestionably, appellee let Gard understand the return in October, 1935, was to comply with his guaranty to furnish water and

no charge for same was contemplated." In support of this contention, the defendant relies chiefly on a letter written by plaintiff on September 25, 1935, in reply to letters to plaintiff from Gard stating that the water supply was inadequate. Plaintiff's letter, Exhibit G, reads as follows:

"Your letter came this morning and I have forwarded it on to Mr. H. E. McConnell who is drilling at Sibley, Iowa.

"I am indeed sorry about this well and I just don't understand it. I had been in hopes with pumping that it would continue and finally make a well. Which usually happens to these kind of wells.

"I have urged Mr. McConnell to get busy and get down here and there is only one thing to do and that is to set over it and take a three inch line and go down to water. This we will be prepared to do according to our contract.

"I feel that by going a little deeper—we will strike a real vein and that is what you want is a good well.

"I shall advise you as quickly as possible when hearing from Mr. McConnell.

"So be prepared most any day now when he gets ready to move on to it again."

 This letter states that plaintiff will take a 3-inch casing and *go down to water according to the contract.* Plaintiff did not guarantee an ample supply of water at 182 feet or at any other particular depth. The defendant agreed to pay a $1.25 per foot for the first 100 feet and further agreed that this price should be raised 50 cents per foot for every additional 100 feet "to the depth of the well". The contract did not contain a limitation on the depth of the well and the plaintiff was entitled to compensation under the terms of the contract if he complied with his guaranty. The defendant's contention distorts the clear meaning of the contract.

 Defendant also contends that there was no modification of the contract with regard to the use of a 3-inch casing for the extended depth; that the cost of the 3-inch casing was less than the 4-inch casing and no allowance was made by the court for the difference in the cost.

Mr. McConnell, the well driller, and his assistant, Mr. Menage, testified for the plaintiff that when they returned to the farm to extend the depth of the well in October, 1935, they told

the defendant that they were back to proceed with the well and try to give him water and that the only thing that could be done to the well was to reduce it to a 3-inch hole because the 4-inch casing was frozen and that Gard replied, "yes, all that can be done is to go down with the 3 inch casing. Any way to suit Mr. McConnell, just so I get a well that will give me plenty of water."

Prior to extending the depth of the well, and on September 25, 1935, the plaintiff wrote defendant in the letter, Exhibit G, that he would take a 3-inch casing and go down to water according to the contract.

Gard testified that he knew the plaintiff intended to use a 3-inch casing in deepening the well; that "I received a letter from the plaintiff stating that he was going to proceed with a 3-inch pipe and I did not object or write and tell them not to. I never entered any objections while they were doing it."

That parties to an agreement may subsequently modify the original agreement by mutual consent needs no citation of authorities. Assent may be implied from the acts of one party in accordance with a change proposed by the other. 13 C. J., 591.

We find that the defendant assented to the modification of the contract and thereby waived that part of the contract requiring a 4-inch casing. No new contract superseding the written contract was created by the modification. The defendant, in assenting to the change, did or said nothing that would lead plaintiff to believe that he would receive less compensation because of the modification and the written contract remained in force and effect as modified by mutual consent, and the compensation agreed upon by the parties to the contract remained the measure of plaintiff's compensation and the trial court was right in basing the amount of plaintiff's recovery on the compensation provided by the contract.

■■■ Defendant also urges that the decree was erroneous because plaintiff failed to prove that he had performed the contract in accordance with its conditions.

After the well was completed in November, 1935, it was tested several times, the last time being during the trial of the case. Each time the test revealed that there were 180 feet of water in the well.

We are convinced that the cause of the failure of the well to produce a constant and ample supply of water is not because

of a lack of an adequate water supply but is in the pump line and especially in the plunger or bucket. Each time a test or examination was made of the pump line and well it was found that the leathers were worn to an extreme degree. The defendant's position is that the wearing of the leathers is due to sand pumped up in the well. He testified that when the pump was pulled during the trial the leathers and plunger were full of fine, granite-like sand and that the sand cut the leathers like knives. The defendant admitted that if the sand was eliminated from the bottom of the casing he would have a good well. The cylinder of the pump is 47 feet from the sand.

It is the contention of the plaintiff that the trouble is entirely due to an inadequate and impractical pump line. Plaintiff's witnesses testified that when the pump was pulled and examined no sand was found in the plunger, cylinder or bucket.

Mr. McConnell, an expert well driller, testified that he advised Mr. Gard to install a 2-inch cylinder, a 2-inch pipe and a 4-leather bucket and wood rods; that Mr. Gard did not follow his advice but used a 1¼-inch pipe, a ½-inch pipe, iron lift rods and a 2-leather bucket. Mr. McConnell further testified:

"A 2 leather bucket was not sufficient for the weight of the water that has to be lifted up by the leather bucket. The 4 leather bucket has more wearing surface on the inside of the cylinder, will handle that amount of water and stand up that much longer under the pressure and wood rods practically float in the 2 inch pipe, which makes it easier pumping all the way around. There is a flexibility in the wood rods that will not pull apart like the iron rods, and iron will stretch under strain and break. The 4 leather bucket has got a much longer life than the 2 leather."

He further testified that the pump line furnished by the defendant was impractical.

Mr. Wassmann, general manager for the plaintiff, testified that in May, 1936, he received a telephone call from Mr. Bundy, attorney for the defendant, that the well had gone dry and asked him to fix it right away; that he wanted it taken care of within five days. The witness with Mr. McConnell then went to the Gard farm and talked with Mr. Gard. The witness there stated to Mr. Gard: "Now, Mr. Gard, let's have an understanding. If it is in the pump line or the leathers we don't feel obligated to

service that part of it, but if it is the well's fault we do; now when we come up and pull this pump line out and find that it is the pump line then you must pay the bill and if it is the well, we will take care of it." Mr. Gard agreed to this proposition. At this time, the pump had been used continuously for three months. It was found that the leathers had been worn off and the plunger had lost all suction power. Mr. Gard paid $9.00 for the new leathers. Mr. Gard admitted that he had an agreement with Mr. Wassmann that if it was the fault of the pump that he would pay him for the work and material in fixing the pump; that the trouble at that time was due to the leather valves and that he paid for the new leather valves and for the labor in installing them in the plunger. At this time the well had been used for a period of 6 months and we assume that if the examination showed that the leathers and plunger were damaged by sand that the defendant would not have voluntarily paid for the repairs and for their installation.

Mr. McConnell testified, without objection, for the plaintiff that when the pump was pulled on May 26, 1936, the trouble was found to be due to excessive wearing of the leathers.

When the pump was examined in September, 1936, during the trial, the leathers were worn on the inside to such a degree that they were torn apart and were down over the flanges of the bucket. Each time that new leathers were furnished, normal production of water was resumed.

We conclude that the evidence fairly establishes that there was a constant head of water at 180 feet and the plaintiff complied with his guaranty to furnish an ample supply of water for the farm and that the failure of the well to work efficiently was due to the impractical and inadequate pump line furnished by the defendant.

Assuming that, as contended by defendant, sand caused the leathers to wear to such an extent that the well could not be considered efficient, the contract provides that:

"Par. 9. In the event it is found that a screen is necessary to properly finish said well, then it must be furnished according to the specifications desired by said driller. The said screen is not included in the above price and is an additional charge."

The plaintiff's testimony and the testimony of Nichols, witness for the defendant, prove that a proper screen would elim-

inate the sand problem. McConnell testified that if a proper screen had been placed at the end of the pipe it would have stopped all sand coming into the casing. Mr. Nichols testified for the defendant that an adequate screen properly installed would hold the sand out. Plaintiff claims that the bottom of the pump is open with a screen in the bottom; that the screen is an old one that defendant had lying about the place and is inadequate.

If a screen were necessary it was the duty of the defendant to furnish it according to the specifications of Mr. McConnell. Apparently, neither party thought the situation warranted a resort to this provision of the contract.

In considering the case we may give consideration to the advantages had by the trial court in determining the truth and we are not convinced the district court was wrong in finding for the plaintiff. We find no reason for disturbing the decree of the district court and the case is affirmed.—Affirmed.

HAMILTON, C. J., and PARSONS, RICHARDS, ANDERSON, SAGER, MITCHELL, KINTZINGER, and DONEGAN, JJ., concur.