ROSA O'DELL, Appellant, v. ALBERT O'DELL, Executor with will annexed, et al., Appellees.

No. 46935.

MARCH 11, 1947.

REHEARING DENIED MAY 9, 1947.

438

Stuart & Stuart, of Chariton, and R. E. Killmar, of Osceola, for appellant.

Frank F. Wilson and Grant L. Hayes, both of Mount Ayr, for appellees.

BLISS, J.—Plaintiff's petition was in four counts. In the first she alleged: The marriage of herself and James O'Dell on April 6, 1927, and the continuance of the marital relation until his death on June 27, 1943; that defendants were children or grandchildren of her husband, and his son Albert was executor of the deceased's estate; that on the day of the marriage, but after the consummation of the ceremony, she and her husband executed a prenuptial agreement; and that because the agreement was executed after the inception of the marriage relation it was not legal or binding, and she as the surviving spouse is entitled to receive as her own property one third of all the property owned by James O'Dell at his death.

In count two she alleged: That after the marriage her husband voluntarily announced his intention of destroying or changing the prenuptial agreement (Exhibit A) for the purpose of giving plaintiff a greater interest in his property at his death than she would receive under the agreement; that not finding the agreement in his metal or "strong box" he thought it was lost or misplaced, and of no further force or effect, and he and plaintiff executed another paper revoking or changing Exhibit A so as to give to plaintiff her widow's or distributive statutory share in his property or estate; that this later-executed paper was placed by the deceased in said box and was not thereafter removed by him but said box and its contents were taken and thereafter kept by Albert O'Dell and plaintiff is unable to produce it.

In count three plaintiff, without waiving any rights under counts one and two, alleged that under both Exhibit A and the last will of deceased she was entitled to the use of the homestead forty acres so long as she lived and did not remarry, and the income, rents, and profits therefrom since his death.

In count four plaintiff, without waiving any rights under

the other counts, alleged her right to a widow's allowance for the period of twelve months from her husband's death.

Under each count plaintiff prayed for a widow's allowance of $2,400. Under count one she also prayed that the antenuptial agreement, Exhibit A, be held invalid from its inception, and that she be decreed the absolute owner of one third of the property of the deceased. Under count two plaintiff prayed, in the event relief under count one was not granted as prayed, that the court decree that deceased had expressly and completely revoked Exhibit A because of the fact that he attempted to destroy it and was prevented from doing so only because it could not be found; and that it be decreed that Exhibit A was also revoked by the execution of the later written instrument, and that she be decreed the owner of one third of all the property owned by the deceased at his death.

The antenuptial agreement was attached to the petition as an exhibit, as was also the deceased's will. The agreement is as follows:

"CONTRACT.

This contract made * * * this 6th day of April, A.D., 1927, by * * * James Odell * * * and Rosa E. Cox * * * This is a Prenuptial Contract. Each party is to retain their own property both Real and Personal for themselves and their children. The wife to have a life interest in the Homestead so long as she remains the wife or widow of James Odell. In case she remarries the property to go to the Heirs of James Odell at once. In case of separation there is to be no claims of either party on the other party's property or money.

Signed this day and date first above written.

James Odell.

Rosa E. Cox.

Signed before me G. E. Turner, a Notary Public in and for Ringgold County, Iowa, by James Odell and Rosa E. Cox this 6th day of April, A.D., 1927.

G. E. Turner, Notary Public."

The will of James O'Dell was drawn by G. E. Turner on

April 6, 1927, at the time Exhibit A was drawn. Its execution by O'Dell was witnessed by Turner and another. It provides first for the payment of all debts and funeral charges. Paragraph 2 provides:

"My will is that my property shall be divided share and share alike between my children. That my widow and younger children shall have a home; The widow as long as she remains My widow and does not remarry, the children until they become of age. * * * My wife's name is Rosa E. Odell."

He then named his eight children and appointed the two oldest as executors.

Defendants in their answer "specifically allege" that Exhibit A was executed before the marriage, and "specifically deny" that it was executed thereafter; they deny that the deceased intended to destroy it, or executed any instrument revoking it, and allege that it was a binding agreement at his death; they deny the destruction by them of the alleged later agreement; they admit the marriage and also the death of James O'Dell as alleged in the petition.

· The court found against plaintiff on all counts excepting count three, on which it found for plaintiff, and rendered decree in conformity with said findings.

I. The only evidential matter in controversy, respecting count one of the petition, was whether the wedding party, consisting of Albert O'Dell and wife, James O'Dell, and Rosa E. Cox, on its way from the James O'Dell farm to Mount Ayr, where the marriage ceremony took place, stopped at the G. E. Turner bank at Kellerton and the prenuptial agreement and the will were executed, or whether the stop was made and these papers were executed after the marriage ceremony at Mount Ayr and on the return trip to the farm. It is undisputed that O'Dell and Mrs. Cox were married about noon, at Mount Ayr, by a justice of the peace. Testifying for herself, plaintiff said that the party drove direct from the farm, without stopping at the Kellerton bank, to Mount Ayr, where the marriage took place, and that after the marriage they stopped at the Kellerton bank on the return home. She also put on G. E. Turner as a witness.

He testified that James O'Dell and Rosa E. Cox stopped at the bank and O'Dell gave directions for the drawing of the pre-nuptial agreement and his will; that he prepared both instruments and O'Dell and Mrs. Cox signed the agreement and O'Dell executed the will. It was Turner's recollection that these instruments were drawn and executed in the forenoon of April 6, 1927, and before the marriage ceremony had been performed. Albert O'Dell and wife, as witnesses for the defendants, testified that the automobile which carried the party, and which Albert O'Dell was driving, stopped at the Kellerton bank on the way to Mount Ayr in the forenoon, and James O'Dell and Mrs. Cox got out and remained in the bank for about a half hour and then came out and the party proceeded to Mount Ayr, where the marriage took place, and they then took a "short cut" home without stopping at Kellerton.

II. The following matters, unless otherwise indicated, are not in dispute: It was the second marriage for each of the parties. Plaintiff was then about fifty-one years old. His age does not appear. She had two children, grown and married. He had several adult children, and two children at home—Hazel and Wayne, respectively ten and twelve years old. Albert and his family lived on another farm of James O'Dell—the east farm —which he and his father operated in partnership. Wayne, whom plaintiff had mothered and cared for since he was twelve, later married and he and his wife lived in the parental home. James O'Dell suffered a stroke of paralysis about three years after the marriage, which disabled him to the day of his death about thirteen years later. On objection based on section 11257, Code, 1939 (section 622.4, Code, 1946, commonly called the "dead man statute"), plaintiff, erroneously, was not permitted to describe his condition. Plaintiff then offered what she proposed to testify—which offer also was refused—that during these thirteen or more years O'Dell was not able to perform any labor; it was exceedingly difficult for him to get around— more so at some times than at others; this difficulty became worse; to a large extent he lost control of his kidneys and bowels; he could walk only with assistance and required the use of a wheel chair; for a time before his death a daughter of plaintiff was

employed to help care for him in 1943. Neighbors testified of his disability and of the added burdens thereby imposed on plaintiff. A farmer neighbor testified O'Dell "required somebody whenever he wanted to move. The last few years he was just at the mercy of someone else's aid. Mrs. O'Dell milked, raised chickens, fed the hogs and cattle and did the general housework on the farm. I would say she was a good wife and willing worker." A neighbor housewife testified, "She did all of the work necessary around the place, keeping house, feeding chickens, gathering eggs, watering calves, milking cows and feeding hogs. I never saw her mistreat Mr. O'Dell. She gave him good care and attention." Others testified to her faithful, constant, and competent care of him. She was a good wife and nurse to him. No one testified to the contrary.

O'Dell appreciated that the advantages of the marriage were largely with him and that the burdens were almost wholly upon his wife. Sometime about the first of August 1940 he wrote to Mrs. Pickens, a married daughter of his wife, who lived with her husband and family in Clarinda, and asked her to come to the farm. About two weeks after receiving the letter, late in the afternoon, she came to the O'Dell home. Mr. O'Dell was sitting in a chair in the south yard. Over objection, properly overruled, he told her that he was not satisfied with the situation on the farm and that he wished to change his will, and asked her to take him to Mount Ayr. She told him it was too late in the day and that she would take him at some other time. In two or three weeks she returned and talked again to James O'Dell. Speaking of that talk, she testified:

"Well, he told me at that time he had had papers signed so that—he spoke of Mother as 'the woman'—can hold her share. He indicated that it was in this connection he asked me to take him to Mount Ayr."

Being asked to give Mr. O'Dell's words, if she could recall them, she testified:

"Well, he told me he had gone to Kellerton and had this paper drawn up so she could hold her widow's share in the estate. He wanted it fixed so she could not be beaten out of it,

\* .\* \* He said that this first paper that was drawn up had disappeared and was destroyed or stolen, and he said he wasn't satisfied with that, that he was going to have a different paper made.''

On interrogation by the court as to whether the statement in the last sentence above was on her first or second trip to see Mr. O'Dell, she replied, ''That wasn't the first time I called.''

On further direct examination by her attorney, she testified:

''It was on this second visit he told me about the first contract being missing and that he had got to work and fixed it up so that Mother could hold her widow's share in the estate. It was the second visit he told me about the missing contract.''

The court rightly overruled defendants' motion to strike all of Mrs. Pickens' testimony of the conversation with Mr. O'Dell concerning the disappearance of papers based upon ''the reason it is incompetent, irrelevant and immaterial, and having to do with a paper which clearly had no testamentary power. There has been no consideration shown for its drawing and no competent proof of its contents or existence.''

Over objection that the testimony called for was ''incompetent, irrelevant and immaterial and hearsay,'' the plaintiff testified:

''Along in the fall of 1940, I recall having a conversation with Wayne's wife regarding the sale of some hogs. We were on the east porch of the house · peeling tomatoes to can. The argument was over selling some hogs. We got to arguing who was to have the bulk of it. I said it ought to be fifty-fifty, and she spoke up and said, 'Nothing of the kind,' that Wayne ought to have all of it. I said, 'You know better than that.' Wayne showed up at the time this argument was taking place. He came in and said, 'What the Hell is going on here?' and came up and struck me twice or three times. I ran in where Dad was on the south porch, sitting in his wheel chair. Wayne came out there. Q. What took place out there? Mr. Wilson: I object to that as the witness is incompetent to testify to a personal

444

transaction with a person since deceased. Q. What took place between Wayne O'Dell and your husband, James O'Dell, in which you took no part? Mr. Wilson: Same objection. The Court: You may answer. A. He struck him with his cane. Dad struck Wayne with his cane and Wayne told him if he did it again, he would kick the guts out of him. Later on that day there was an argument and conversation with Wayne and his father in which I took no part."

The court did not err in overruling any of the objections to the testimony of plaintiff.

"Q. Now, tell the Court where that was and what you heard said between Wayne and his father? Mr. Wilson: That is objected to as the witness is incompetent to testify to a personal transaction with a person since deceased, *and an opinion and conclusion whether or not she took part in it.*"

There was no basis for the italicized part of the objection, and the fore part of the objection was technically deficient in not being definitely identified with section 11257, Code, 1939.

"The Court: You may answer. A. Well, he, James O'Dell, wanted me to get the box."

The answer was stricken on the objection that it was "a direct transaction with her husband."

While the request of plaintiff's husband that she bring him the metal "strong box" from the top shelf in the pantry and her compliance therewith was the taking place of a matter between them, it may be fairly questioned whether it was a "personal transaction" within the purview of said section 11257. If so, her passing the butter to him at a meal would also be. In Martin v. Shannon, 92 Iowa 374, 377, 60 N. W. 645, the court said:

"By a 'personal transaction' the statute means some business or negotiations between two or more individuals."

In Sheldon v. Thornburg, 153 Iowa 622, 626, 133 N. W. 1076, a more involved definition was given, which was criticized and explained in Hayes v. Snader, 182 Iowa 443–452, 165 N. W.

1041. In Lucas v. McDonald & Son, 126 Iowa 678, 679, 102 N. W. 532, the wife of the plaintiff was permitted to testify over objection that the deceased requested her to call her husband into the room of deceased. But conceding, arguendo, that bringing the box to her husband was a personal transaction under the statute, it did not make her a participant in what her husband, or what he and Wayne, did thereafter. The record shows that she took no part in any way in what he did nor in the conversation between her husband and Wayne. The court refused to permit her to testify that her husband in her presence examined the papers in the box. Her testimony that her husband opened the box and could not find the paper he was hunting and called Wayne to look was stricken, and she was held incompetent to testify to the conversation between Wayne and her husband. The court gave as its reason for the rulings that, since plaintiff had produced the box, what followed was all a part of the same transaction. The court also struck her answer that her only participation was in producing the box. Plaintiff then offered proof—which offer was refused—that in an examination of the contents of the box by her husband, Exhibit A, the prenuptial contract, was not found, and her husband accused Wayne of having taken the paper; that Wayne denied it and cursed his father, and the latter then asked Wayne to take him to Kellerton, as he wanted to go there to draw another agreement where Rosa would get her widow's share, and have it drawn so the "kids couldn't beat her out of it"; that Wayne objected to taking his father to Kellerton and the latter then said he would get one of his neighbors to do so, and Wayne then said he would take him. She took no part in the conversation at any time. Plaintiff was held incompetent to testify that she and Wayne and her husband went in a car to Kellerton, but, omitting any mention of her husband, she was permitted to testify that she and Wayne went in an automobile to Burger's store at Kellerton. Again she was held incompetent to say that her husband went into the store with them. She testified that she and Wayne went into the store and sat on a settee, and, over objection, that Wayne left the store at the request of her

446

husband to go and get Mr. Turner and bring him to the store. She took no part in the conversation in the store.

█ The court erred, to the prejudice of the plaintiff, in a number of rulings holding her incompetent under said section 11257. Other rulings were not prejudicial. The testimony excluded was necessarily not considered by the court. This court has repeatedly held that matters of fact concerning the decedent, learned solely by observation and not by a transaction or communication with him, may be testified to by one designated as an incompetent witness under the statute. The witness was not incompetent to testify to the physical condition of her husband, nor to her observation of him as he examined the "strong box" and failed to find the prenuptial contract, to which fact he called the attention of Wayne. While she knew better than anyone else his physical condition, there was no substantial error in not permitting her to testify to his disabilities, as other witnesses sufficiently covered the matter. But no witness testified to the matters concerning the examination of the box. That she was a competent witness in that matter, see In re Estate of Talty, 232 Iowa 280, 282, 5 N. W. 2d 584, 144 A. L. R. 859, and cases cited. Her part ended in the matter when she produced the box.

Plaintiff took no part in the conversation between her husband and Wayne. She was competent to testify to that conversation. We have so held many times. See Erusha v. Tomash, 98 Iowa 510, 513–515, 67 N. W. 390 (in that case the wife testified to seeing her husband make payment to the deceased payee of their joint promissory note) ; In re Will of Fish, 220 Iowa 1247–1251, 264 N. W. 123, and cases cited; Gardner v. Marquis, 224 Iowa 458, 461, 462, 275 N. W. 493; Johnson v. Johnson, 52 Iowa 586, 3 N. W. 661.

█ The conversation and incidents which took place between the husband and Wayne were confined strictly to them. It is true that these matters had an incidental and indirect relation to the writing nullifying the prenuptial agreement and granting to her her widow's distributive share in her husband's estate at his death. But this court has repeatedly held that a witness, prohibited by the "dead man statute" from testifying

against specified persons, is not incompetent to testify to facts from which inferences may be drawn tending to establish a claim or liability against, or a transaction with, or a service to, one under disability or his estate. See Yoder v. Engelbert, 155 Iowa 515, 517, 136 N. W. 522; Martin v. Shannon, supra, 92 Iowa 374, 376–378, 60 N. W. 645; Furenes v. Eide, 109 Iowa 511, 514, 80 N. W. 539, 77 Am. St. Rep. 545; McElhenney v. Hendricks, 82 Iowa 657, 659, 48 N. W. 1056; Campbell v. Collins, 133 Iowa 152, 154, 155, 110 N. W. 435, 436 (stating, ''This court has often held that the statute was not designed to exclude evidence, not itself obnoxious to its prohibition, from which inferences of what was done between the parties might be drawn.''); Graham v. McKinney, 147 Iowa 164, 166, 167, 125 N. W. 840; Marietta v. Marietta, 90 Iowa 201–204, 57 N. W. 708; Walkley v. Clarke, 107 Iowa 451, 454, 455, 78 N. W. 70; Scott v. Brenton, 168 Iowa 201, 211, 150 N. W. 56; In re Estate of LaGrange, 191 Iowa 129, 132, 181 N. W. 807 (where the claimant testified that she placed the certificates of deposit, which she alleged her deceased father gave her, in her suitcase in his presence); Sankey v. Cook, 82 Iowa 125, 128, 47 N. W. 1077; In re Estate of Allis, 221 Iowa 918–922, 267 N. W. 683; Lucas v. McDonald & Son, supra, 126 Iowa 678, 679, 102 N. W. 1041; Dysart v. Furrow, 90 Iowa 59, 62, 57 N. W. 644; Hayes v. Snader, supra, 182 Iowa 443–447, 165 N. W. 1041, 1043 (stating, ''The vital thing is, what is the nature of the proof, not what does it tend to establish. The sole question here is whether what was objected to spoke to a 'personal transaction or communication between such witness and the decedent.' If it did not do that, it is wholly immaterial who gave the testimony, or what it tended to establish).''

The trial court was in error in holding that, simply because the witness brought the box to her husband in his wheel chair, she became a participant in his search through the box and in his conversation with Wayne, and thereby an incompetent witness.

■ Going back now to the Burger store and the drafting of the second agreement by Turner. Plaintiff testified:

''Mr. O'Dell told Mr. Turner that he wanted a paper drawn

up. That the other one had been destroyed and lost. Mr. O'Dell said he wanted a paper drawn up so Rosa could have her widow's share and the boys couldn't take it away from her. *Mr. Turner left the store for a while and when he came back he brought a paper with him. He read the paper to us and asked us to sign it. Dad took the paper and put it in his pocket.*" (Italicized only for identification.)

The court first let all of this testimony in and then struck it. The italicized testimony refers only to matters of observation. She took no part in picking up the paper or in putting it in her husband's pocket. She would not be an incompetent witness to these matters unless these acts by her husband could be said to be a part of the transaction or business between them of executing the paper. The part of the testimony not italicized was rightly stricken. The plaintiff did not take part in the conversation between O'Dell and Turner. But what O'Dell said was a direction to Turner as to what he wished stated in the paper. It was said in the presence of plaintiff, and was a part of the transaction—of the preparation, drafting, and signing of the paper. She was incompetent to testify to it. It comes within the rule of In re Estate of Runnells, 203 Iowa 144, 212 N. W. 327; In re Estate of Willmott, 211 Iowa 34, 230 N. W. 330; 71 A. L. R. 1018; and Maasdam v. Estate of Maasdam, 237 Iowa 877, 24 N. W. 2d 316.

The striking of the italicized testimony did not hurt plaintiff, as the execution of the paper was established by Turner's testimony. But Turner's memory was not as complete as plaintiff's respecting what he was told to put in the paper or as to what he did put in it.

Mr. Turner recalled clearly the evening in September or October 1940, when Wayne O'Dell came to his real estate and insurance office in Kellerton and asked him to come to the Burger store, as his father wished to see him. He came to the store with Wayne and found Mr. and Mrs. O'Dell sitting on the settee in the middle of the store. Mr. O'Dell told him what he wished to see him about:

"Q. Tell the court what James O'Dell told you that evening.

A. Bob, I don't believe I can tell you all of the words he told me. He told me he wanted a contract *and he told me the way he wanted it and I wrote it.* Q. Now, I will ask you to refresh your recollection, did he mention anything about this old contract that you had drawn on the date of their marriage? A. I don't recall that he did, Bob. I have heard it testified that he did but I don't remember distinctly that Mr. O'Dell said anything to me about its being destroyed or mislaid or anything. Q. Well now, then, just state to the best of your recollection the substance of what he told you that he wanted you to put in the agreement which you were to draw. A. I just can't remember all of the things he told me to put in there. Q. Now then, Mr. Turner, did you, *pursuant to his direction,* leave the store and prepare an agreement? A. Yes, I did. I went across the street to my office to prepare the agreement. I think it was on one sheet of paper. When I returned to the store, I read the contract to James O'Dell. Mrs. O'Dell was there at the time. * * * Well, I don't remember the exact wording of any of this paper. I know when I looked it over, *I thought then he hadn't kicked her out. She was to get a fair settlement,* but it was twenty years ago [it was five years ago] and I just don't know. * * * I just don't remember. I can't get what the terms were. * * * I remember at the time the paper, I wrote, *I thought Mr. O'Dell was providing for this woman,* but just how or what the things were that he was providing, I just don't remember. Q. What is your best recollection to what extent he was providing for her? A. I don't know what extent. *I felt it was enough to take care of her but I just don't know.* I did not keep a copy of this paper. I haven't seen it since I saw it in the store in the fall of 1940. The paper was signed at that time by James O'Dell and his wife, Mrs. O'Dell, in my presence.''

There is no direct contradiction in the matters of fact set out in Division II hereof. Section 11257, Code, 1939, barred plaintiff from being a witness to the matters testified to by Turner. But Turner did not testify that the writing which he prepared in the fall of 1940 did not give plaintiff a third of, or the statutory widow's share in, her deceased husband's estate. His testimony was only that he could not remember the exact

wording or terms of the paper. His testimony is not in conflict with that of Mrs. Pickens, nor with what the plaintiff testified, or offered to testify to, of the incidents and conversation at the O'Dell home on the afternoon before the meeting in Burger's store. Instead it corroborates each of them. The fact that all the terms of the lost instrument could not be shown clearly and definitely was not fatal to plaintiff's case. The ultimate fact to be ascertained is whether the antenuptial agreement was rescinded, or so modified that the limitation on her property right in the estate of the deceased was abrogated, and her widow's statutory share was restored. If, under the whole record, this is shown, it is sufficient, and it is not necessary that other terms or details, if any, of the instrument be shown.

There is no basis for reasonable doubt as to the intention of O'Dell to modify or rescind the prenuptial agreement and to give to her the distributive share of his estate to which she was entitled by statute in the absence of said agreement. In seeking to ascertain the intent we look for the motives and reasons most likely to have been inducing causes. The record shows him to have been a just and honorable man. It also shows conduct on the part of plaintiff, and other conditions and circumstances, such as would strongly appeal to a man of that character to do just what plaintiff insists that he intended to do and did do. Regardless of the fact that the plaintiff was performing only the duties and meeting the responsibilities incumbent upon her as a wife, O'Dell deeply appreciated that, because of his affliction, she was getting the worst of their marital bargain. He had never intended that bargain to be so harsh to her. He was not satisfied with conditions at home nor with the old contract. Before Mrs. Pickens could return, the disgraceful occurrence on the porch brought to an immediate decision his determination to change or revoke the prenuptial agreement and to give the plaintiff her statutory distributive share. With that in mind he examined the contents of the metal box, and, not finding the contract, he accused Wayne of taking it. It was then he insisted that Wayne take him to Kellerton so that another agreement be drawn giving his wife her widow's share and keeping "the kids from beating her out of it." The

court did not permit plaintiff to testify to this conversation between her husband and Wayne, in which she took no part, and it appears in the record only in her offer of proof. The court's ruling was prejudicial error and the testimony offered must be considered by this court. O'Dell's conclusion that the prenuptial agreement had been removed from the box, his intention to change or revoke it, and the execution of a paper granting to plaintiff her one-third distributive share as a widow, are clearly established by the testimony of Mrs. Pickens, the refused testimony of the plaintiff, and the corroborative testimony of Turner. This testimony stands without the slightest refutation, contradiction, or impeachment, and it is corroborated by every other item of testimony and by every circumstance in the record. Defendants offered no testimony to the contrary. There is no other reasonable inference or assumption than that O'Dell intended to rescind or modify the old contract and restore to plaintiff her distributive share on his death. That the paper executed in September or October 1940, in Burger's store, effected that purpose and intention is quite as certainly established. Plaintiff heard her husband tell Wayne that he intended to execute such a paper. Turner read that paper to her and she signed it. Uneducated as she was, and unable to read or write, yet she must have understood from the reading of the paper that it effected her husband's expressed intentions. Turner testified that, *"He [O'Dell] told me he wanted a contract and he told me the way he wanted it and I wrote it."* From the intentions which O'Dell had expressed to others of drawing a paper to restore his wife's right to a widow's share, there is no other reasonable inference than that is what he told Turner he wished put in the contract, and certainly it should be assumed that Turner put just that in the contract, even though he testified he had no definite memory of what it contained. Defendants did not see fit to offer any testimony in denial. Plaintiff's testimony and her proffered testimony concerning what took place on the porch, including the conversation between her husband and Wayne, could have been denied by Wayne and his wife, but they were not called as witnesses. One purpose of the

"dead man statute" is to close the mouth of the living participant relative to transactions or communications with a person whose mouth is closed by death. That was not the situation here. O'Dell was not available as a witness. But Wayne, his son and one of the defendants claiming under him as an heir, was present to speak for his father and for himself and his codefendants. He could have testified to or denied any conversation between himself and father that autumn day in 1940 concerning his father's trip to Kellerton to have the paper drawn. He could have testified as to what took place in Burger's store. But when the court erroneously refused to permit the plaintiff to testify about these matters, the defendants concluded that Wayne should remain silent, and thus deprive the trial court and this court of evidence of matters of which each side had equal knowledge. The usual inequality which the statute was enacted to prevent did not exist in this case. Plaintiff urges that other jurisdictions have held that statutes in substance like said section 11257 have no application in similar situations. Citing Fulkerson v. Thornton, 68 Mo. 468; Peacock v. Stott, 90 N. C. 518; Moore v. Harlan & Hollingsworth, 37 Ga. 623; Read v. Sturtevant, 40 Vt. 521. But plaintiff's case does not depend upon such a holding by us, however sound it may be.

When Wayne and plaintiff and her husband left Burger's store that night they went directly home. She was asked this question: "Upon your arrival home * * * Mrs. O'Dell did you see what was done with the paper that you and your husband had signed?"

Although it was shown, without contradiction, by Turner's testimony, that a paper was signed by them that evening, objection under section 11257 was sustained. A like objection was sustained to this question: "State whether or not you know that that paper * * * was put in this box that we have been referring to as the strong box?"

Neither question on its face called for testimony that was obnoxious to the prohibition of the statute. The first question called only for a matter of observation, and the second called for her personal knowledge and observation and not for a transaction or communication. Proffer was made that she had per-

sonal knowledge that the paper executed in October 1940 was placed in the strong box and was never removed by her or by anyone else in her presence, and that the box was placed on a shelf beyond the reach of her husband in his physical condition.

Later her husband's physical condition became much worse and Albert O'Dell was appointed his guardian. It is undenied that thereafter Albert took the box and its key into his possession. On his father's death he was appointed executor. He testified that he found the prenuptial contract of 1927, but never saw or found the paper executed in October 1940.

The only attack made upon the testimony of Mrs. Pickens is that it was incompetent in that it referred to self-serving declarations of the deceased. This contention is broader than any objection made to her testimony. No such objection was made. Furthermore, there is no basis in the record for such contention. The fair inference is that the declarations were against his interest. The prenuptial agreement was a limitation upon her interest in his estate, while the declarations were of his intention to increase that interest and of his executed act carrying that intention into effect. Defendants' citation of and quotation from Truitt v. Truitt, 290 Ky. 632, 162 S. W. 2d 31, 140 A. L. R. 1127, do not aid them.

III. The record establishes by evidence sufficient in quality and quantity that James O'Dell voluntarily and on his own initiative revoked or modified the prenuptial agreement of April 6, 1927, and granted and gave to her a distributive share of one third in all the property which he owned at his death, to all of which she gave her full consent and acceptance. It matters not that the defendants produced the prenuptial agreement after decedent's death. He thought it was lost or stolen. He was not satisfied with it and wished to rescind or change it and substitute for it an instrument giving her a widow's share under the statute. They agreed upon this and carried it into effect by the paper executed in Burger's store. Though the prenuptial contract was not physically destroyed and remained in existence, its binding force and effect insofar as it deprived her of her distributive share in his estate had been destroyed by the acts of its makers.

■ The district court, in its opinion or "Ruling of the Court," said:

"It is obvious, in view of the fact that this pre-nuptial contract was produced on the trial of this case, that it never in fact was destroyed, and unless there was some specific instrument signed by both of the contracting parties thereto, agreeing that it be rescinded, it would continue to be in full force and effect."

This is stating the law too favorably for defendants. As we have just stated, the physical existence of the paper contract may be of little importance. If the parties have mutually agreed to its revocation and dissolution, and this is established, that, of course, is an end of the controversy. The fact that an adversely interested person has secreted the instrument to prevent its destruction or cancellation by the makers does not defeat its mutual abrogation by the latter. In a similar controversy over the mutual revocation of an antenuptial agreement, the Kansas court, in Gordon v. Munn, 87 Kan. 624, 634, 125 P. 1, 4, Ann. Cas. 1914A, 783, said:

"It is the opinion of this court that in view of the general verdict this answer should be considered as relating to the document—the paper itself—rather than to the agreement. The actual destruction of the paper would be competent evidence upon that issue in connection with the accompanying circumstances, but if the contract was canceled by agreement, that is, if the parties mutually agreed that it should be annulled and no longer be in effect, the destruction of the paper upon which it was written was not controlling."

For the same reasons, the preservation of the paper by someone contrary to the intention of the makers would be of no effect.

IV. Speaking of the instrument executed in the fall of 1940, the court also said:

"There is nothing in the statement of what it is alleged James O'Dell told Mr. Turner to put into the contract in regard

to any rescission by mutual agreement of the pre-nuptial contract, so far as it is described in the petition, which would indicate that Mrs. Rosa O'Dell thereby waived that provision of the prenuptial contract which deprived her husband of the right to share in her estate in event he survived her."

Antenuptial contracts—designated in this record as prenuptial contracts—are in no way different from any other ordinary contract. They are to be considered, construed, and treated as are contracts in general. In re Estate of Shepherd, 220 Iowa 12, 19, 261 N. W. 35, 39; Cummings v. Wood, 197 Iowa 1356, 1358, 199 N. W. 369. Any executory contract, when the rights of others are not involved, may be rescinded altogether, or modified, by the mutual consent of the parties. Either party may waive any right thereunder. Those who are qualified to make an antenuptial or other contract are likewise qualified, by mutual consent to eliminate or modify any part thereof, or to unmake the contract altogether, or to substitute a new contract. The court said, in Esterly Harvesting Mach. Co. v. Bemis, 93 Iowa 398, 400, 61 N. W. 980, 981:

"A claim that the parties could make such a contract, and then could not, as between themselves, unmake or change it, would involve a legal absurdity."

Also, in Mortensen v. Frederickson Bros., 190 Iowa 832, 845, 846, 180 N. W. 977, 982, the court stated:

"Certainly, the parties had a right to make such a new contract. They had a right to make any kind of a new contract respecting the subject-matter that was not in violation of law. * * * It is undoubtedly the law that the parties to a contract can mutually agree to a rescission of the same. This is the rule of our cases. Pardoe v. Jones, 161 Iowa 426, 430 [143 N. W. 405]; Tague v. McColm, 145 Iowa 179 [181, 123 N. W. 960]; Quarton v. American Law Book Co., 143 Iowa 517, 528 [529, 121 N. W. 1009]."

Even where the contract specifies the method by which it may be determined, as said in Webster County Buick Co. v.

Nebraska Buick Auto Co., 216 Iowa 485, 487, 488, 249 N. W. 203, 204, that "does not take away the right of the parties to terminate the contract in any other way or to supersede it with another contract by mutual agreement. There is no restraint on the right of parties to cancel a contract by mutual agreement, where rights of third parties have not intervened. Wilson v. Holub, 202 Iowa 550 [554], 210 N. W. 593, 58 A. L. R. 646." To like effect, see Lambertson v. National Inv. & Fin. Co., 200 Iowa 527, 532, 202 N. W. 119; Collins v. Gard, 224 Iowa 236, 240, 275 N. W. 392; Osborne & Co. v. Backer, 81 Iowa 375, 379, 47 N. W. 70; Rice & Hutchins Shoe Co. v. Oransky & Sons, 184 Iowa 6, 7, 166 N. W. 690; Vande Stouwe v. Bankers L. Co., 218 Iowa 1182, 1197, 254 N. W. 790, 798; American Sav. Bk. v. Borcherding, 201 Iowa 765, 768, 208 N. W. 518; Central Iowa Motors Co. v. Clancy, 206 Iowa 1090, 1092, 221 N. W. 774, 775 (the court saying, "Of course, this agreement [rescission] may be either expressed or implied"); Morse v. Slocum, 192 Iowa 1080, 1094, 186 N. W. 22.

The important matter is the mutual consent and intent to rescind, modify, or substitute, and the manner of putting it into effect is of no particular consequence and is to be determined by the parties. Such rescission or modification requires no particular method, manner, or form. In Griffey v. Lubben, 196 Iowa 465, 468, 193 N. W. 410, 411, the court, after quoting a Massachusetts case, said:

"This is only another way of stating the fundamental proposition that, so long as any contract, written or oral, remains executory, it is an essential attribute of the right of persons to do what they will with their own (so long as their acts do not prejudice the rights of others); that the parties thereto may, by mutual consent, change, alter, or amend its terms, or may abandon it altogether; and that, such arrangement once made, it affords a complete defense by either to any assertion by the other of any right based upon the original unperformed contract. It makes little difference whether a defense of this character be classed as waiver or estoppel, or be given any other technical label, it operates, when pleaded and proved, to

relieve from liability the party sought to be charged upon the alleged contract.''

An executory written contract may be rescinded, canceled, or revoked, by another written instrument, or orally, or by matters in pais. A ''specific instrument signed by both of the contracting parties thereto, agreeing that it be rescinded,'' is not necessary. Neither is an express statement of rescission nor an express release of obligations by either party necessary in such instrument. In Mortensen v. Frederickson Bros., supra, 190 Iowa 832, 847, 848, 180 N. W. 977, 983, the court cited with approval this quotation from 2 Black on Rescission and Cancellation, section 528:

'' 'The' rescission of a contract by mutual consent does not require a formal agreement or release, but may result from any act or any course of conduct of the parties which clearly indicates their mutual understanding that the contract is abrogated or terminated, or from the acquiescence of one party in its explicit repudiation by the other.' * * * There can be rescission by the acts and conduct of the parties, without an express oral agreement to rescind.''

In Cincotta v. Catania, 95 Cal. App. 99, 100, 272 P. 330, 331, the court said that it is unnecessary to prove the parties used the words, ''We do mutually rescind the contract,'' but rescission may be proved otherwise.

▮▮▮ A contract may be rescinded by a subsequently executed instrument or agreement inconsistent with the first. If the first agreement and the substituted instrument cannot stand together the latter will thereby effect a rescission of the first. An antenuptial contract ordinarily limits the property right or distributive share of a spouse in the estate of the deceased spouse. A subsequently executed instrument destroying the limitation or expressly restoring the right to the distributive share necessarily effects a rescission of the antenuptial contract in that respect. An express statement to that effect is not necessary. Whether the paper signed in the fall of 1940 was a contract or a declaration of O'Dell accepted and acquiesced in by the

plaintiff, all the attending circumstances and surrounding conditions point to their executed intention to rescind or modify the antenuptial agreement so far as it deprived her of her widow's share in his property. If that was their purpose it is immaterial what you call it. Speaking of a contract dissolving a prior contract, the court, in Reit v. Driesen, 212 Iowa 1011, 1017, 237 N. W. 325, 327, said:

"Whether it be termed a substitution, waiver, abrogation, merger, abandonment, novation or rescission of the first contract, the arrangement of March .16, 1921, constituted a new contract in which the previous contract was merged and by which it was discharged."

"An agreement, when changed by the mutual consent of the parties, becomes a new agreement. It takes the place of the old. A contract may be abrogated in part, and stand as to the residue." Hawkeye Clay Works v. Globe & Rutgers F. Ins. Co., 202 Iowa 1270, 1274, 211 N. W. 860, 863.

The propositions and principles of law stated above have the uniform sanction of the courts.

"Persons competent to contract can as validly agree to rescind a contract already made as they could agree to make it originally. * * * Moreover, a contract may be discharged by conduct as well as by words." 12 Am. Jur., Contracts, section 431.

"A contract need not be rescinded by an express agreement to that effect.. The rule is well settled that the parties to a contract may rescind it by making a new contract inconsistent therewith. If the parties to a contract make a new and independent agreement concerning the same matter and the terms of the latter are so inconsistent with those of the former that they cannot stand together, the latter may be construed to discharge the former." 12 Am. Jur., Contracts, section 433.

See, also, 17 C. J. S., Contracts, section 395; 6 R. C. L., Contracts, section 307.

"As a contract is the result of an agreement, so an agreement may put an end to a contract. Therefore, a contract may be discharged or abrogated at any time before the performance is due by a new agreement with the effect of altering the terms of the original agreement or of rescinding it altogether * * *." 17 C. J. S., Contracts, section 394.

"Form of Agreement. * * * The cancellation, abandonment, or rescission of a written contract may not only be written but it may also be oral or by implied agreement, which may be shown by the acts of the parties and the surrounding circumstances." 17 C. J. S., Contracts, section 388.

"Whether or not such an executory contract has been rescinded by mutual consent is a question of fact which need not be proved by express terms, but may be inferred from the attendant circumstances and the conduct of the parties. 6 Williston on Contracts, revised edition, sec. 1826." Lewis v. Marsters, 139 Maine 17, 22, 26 A. 2d 649, 651.

In Gordon v. Munn, supra, 87 Kan. 624, 635, 125 P. 1, 5, Ann. Cas. 1914A, 783, the court said:

"In determining whether the antenuptial contract was canceled or annulled by mutual agreement * * * all the circumstances of the situation tending to prove the intention of the parties should be considered. * * * the age and enfeebled condition of the husband, the care and attention of the wife, their feelings toward each other, the disposition made of the instrument, and every other fact having a natural relevancy to the inquiry."

On this appeal the circumstances and the reasonable inferences, without exception, point definitely to the intention of these parties—particularly the husband—to modify or rescind the antenuptial contract and restore to the wife her right to a widow's distributive share: her much greater service in the operation of the farm than he, her devoted care of him in his helpless condition for so many years, the hostile attitude of Wayne and his wife to her, his feeling that the children would take advantage of her, his progressive physical decline and the

likelihood that she would survive him, his dissatisfaction with conditions in the home and the hardship of the prenuptial agreement, his expressed desire to destroy the agreement, his feeling that Wayne had removed it from the box with an ulterior purpose, the porch incident, his expressed intention to restore to his wife her dower interest, his trip to Turner to have a paper drawn to carry out this intention, the execution of a paper apparently satisfactory to him and his wife. The reappearance of the antenuptial agreement and the disappearance of the paper restoring to his wife her widow's share confirm the correctness of his conclusion that there were those who were interested in beating her out of that share. It is significant that the strong box was in the possession of Albert for some time before the death of James O'Dell.

V. The defendants in their printed argument, referring to the paper executed in Burger's store, state:

"* * * no other contract was produced at the trial. If there had been such a contract there would have been no consideration therefor, and the decedent could not have made a contract with his wife under the circumstances."

The court also stated there was no consideration for the agreement.

Any dissolution or cancellation of a prenuptial agreement or of any other executory contract may be effected by the mutual consent or agreement of the parties to do so. Lawful cause is not necessary. No new consideration is needed. The mutual release from the old contract is adequate consideration. The principle is thus stated in 17 C. J. S., Contracts, section 391:

"Consideration. While a contract remains executory on both sides, an agreement to annul on one side is a sufficient consideration for the agreement to annul on the other, but if the contract has been executed on one side, other consideration is necessary."

While the prenuptial agreement does not mention the intended marriage of the parties, that was the reason for the contract. The marriage was consummated. But the provisions of

the agreement respecting mutual renunciation of property rights in the estate of the other were wholly executory while both of them lived. And during that time they might mutually consent to alter or abrogate those provisions as they saw fit.

O'Dell had told Mrs. Pickens that he was not satisfied with conditions and that he wished to go to Mount Ayr to change his will—to make a different disposition of his property after death than he had made. On the day of the quarrel on the porch, but later in the day, he searched for the prenuptial contract and did not find it in the "strong box" where he kept his papers. The will was no doubt in the box. But he was not looking for the will. He was trying to find the prenuptial agreement. What he intended to do with it we do not know. Wayne denied his accusation of having taken it. Not knowing what had become of the agreement, and desiring to change it or rescind it to give a widow's share to his wife, they went to Turner with the clearly evident purpose of having such an instrument drawn.

Defendants and the trial court were in error in stating that this agreement was without consideration and therefore was invalid. It was not without consideration. It was a new contract taking the place of the old agreement—a substitution for it—and it required no other or new consideration. This court has so held. In Strahn v. Johnson, 197 Iowa 1324, 1332, 196 N. W. 731, 734, the parties had entered into a contract for the exchange of real estate. While it was still executory, and before either party had parted with his property, the contract was abandoned, so the defendant contended, and a new contract was entered into by them. Plaintiff sued defendant for damages for an alleged breach of the first contract. There was a verdict and judgment for the defendant. Plaintiff, on appeal, assigned error for failure of the trial court to instruct that there was no consideration for the second contract. In affirming and holding there was no error, this court said:

"It seems to us that the court was not in error in instructing the jury, in effect, that the parties had a right to abandon by agreement, on January 31st, when they met to deal, the

unperformed contract of January 10th, in any manner that they might agree upon. The contract of January 10th was executory only, and while it was executory, no new consideration was required to release the same, or for the substituted contract of January 31st.''

Decisions of this court were cited in support of the holding.

The same principle of law was stated in Richards v. Hellen & Son, 153 Iowa 66, 71, 72, 133 N. W. 393, 395, thus:

''It is apparent that the contract on which plaintiff relies is based upon a good consideration; that is to say, it was executed as a substitute for prior ones, and the prior agreements were abandoned and rescinded. That this is a sufficient consideration is hornbook law. See Page on Contracts, vol. 3, section 1344; Bishop on Contracts, sections 813–816.''

See, also, Vande Stouwe v. Bankers L. Co., supra, 218 Iowa 1182, 1197, 254 N. W. 790, 798, where the court said:

''That the contract under which such future rights and liabilities will arise may be canceled by a new agreement is equally certain. 13 C. J., page 600, section 621 et seq. In such case there is ample consideration for the new agreement even though there be perfect accord between the parties to the old contract.''

Other authorities and decisions support the principle above stated. In Wright v. Fischer, 24 Tenn. App. 650, 658, 148 S. W. 2d 49, 53, the court said:

''Ordinarily, the parties to a contract of any kind may at any time rescind it by their mutual consent and agreement (2 Black on Rescission and Cancellation (1st Ed.), 1231, sec. 521), or change or modify the terms of their contract without rescinding it entirely, if the rights of third parties have not intervened. And if the parties agree not merely to rescind the existing contract, but make a new contract with reference to the same subject-matter, the new contract taking the place of the old, the substitution of the one for the other is a sufficient

consideration to support the new agreement. 2 Black on Rescission and Cancellation (1st Ed.), 1235, sec. 523.''

In Stoddard & Son v. Village of North Troy, 102 Vt. 462, 468, 150 A. 148, 150, the court said:

''The parties might, therefore, at any time before a breach of it, by a new contract not in writing, waive, dissolve, or annul the former agreement, or in any manner add to, subtract from, or vary, or qualify its terms, and thus make a new contract. Powers v. Rutland R. R. Co., 88 Vt. 376, 394, 395, 92 Atl. 463, and cases cited. Since the original contract was executory, and no breach had as yet occurred, no new consideration was required. Hill et al. v. Scott, 101 Vt. 356, 361, 143 Atl. 276.''

In Hill v. Scott, just cited, numerous cases are cited in support.

The court erred in holding that the writing executed in 1940 was without consideration.

VI. After stating that there was no consideration for this contract, the court said and held:

''She was the wife of James O'Dell and she could not contract with him in regard to her statutory right in his property.''

The court did not specify what statute or Code section was referred to. We assume it was section 10447, Code, 1939 (section 597.2, Code, 1946). If so, the court was in error. This court, in Fisher v. Koontz, 110 Iowa 498, 502, 80 N. W. 551, held that said section (3154 of the 1897 Code) did not prohibit a husband and wife from making a postnuptial contract canceling an antenuptial agreement and restoring her marital property rights, which she had relinquished.

VII. Plaintiff vigorously insists that she established the allegation of count one of her petition that the antenuptial agreement was not executed until after the marriage of herself and O'Dell and was for that reason of no force and effect. In view of our conclusion that plaintiff established the allegations of count two, thereby requiring a reversal of the decree of the district court and a decree for the plaintiff, we do not find it

necessary to discuss or determine the aforesaid issue in count one.

 VIII. The trial court held that the facts presented in the record were not sufficient to enable it to pass upon the merits of plaintiff's allegations and prayer for a decree awarding her the sum of $2,400 as a widow's allowance for the period of twelve months after her husband's death, and therefore did not allow the claim. The value of the estate of the deceased, or of what plaintiff's needs may be, and the proceedings in the estate with respect to any allowance are not before us. It is our conclusion that the ruling of the trial court in the matter was proper. However, neither that judgment nor our opinion herein will prejudice or be a bar to any appropriate proceeding available to plaintiff with respect to such an allowance.

 IX. When plaintiff began testifying as her first witness objections to questions asked her were, upon the insistence of defendants' attorneys, ruled upon by the court, and when the objections were sustained the witness was not permitted to answer, and plaintiff's attorneys were then required to make an offer of proof of what the witness would have answered. This colloquy took place between court and counsel respecting the procedure:

"Mr. Stuart: The thought I had in mind is whether or not you rule on the objections as they are made. The Court: I am required, as I understand the law, to rule if someone insists on a ruling. * * * Mr. Stuart: I wasn't asking that the general objection be applied, but my understanding was in equity that the practice, at least, was for the Court to accept the testimony subject to the objection made. The Court: That is often done, in fact, most of the cases I have tried in equity in this district have been tried in that way, but I have always held to the opinion that if counsel insisted on a ruling he had a right to have the court rule."

After an answer had been stricken, counsel for plaintiff said:

"I want to ask a question. Would it be agreeable to the Court and counsel that when the objection is sustained, the

witness be permitted to go ahead and make her answer, which would be our offer—Mr. Wilson: It will certainly not. Mr. Stuart: Offer to prove. I never saw this before. * * * I want to make my record so the Supreme Court can see it. * * * The Court: You can offer to make the proof and if the Court denies your offer you can proceed.''

That was the way the trial proceeded and much of plaintiff's testimony went into the record as an offer of proof.

The procedure followed was not in accord with usual equity practice in Iowa. See Rankin v. Schiereck, 166 Iowa 10, 16, 147 N. W. 180, 182, where the court said:

"The proceeding is in equity. The rules of evidence in such cases are such that the trial judge, while noting objections, may not exclude offered testimony.''

In Donaldson v. Smith, 122 Iowa 388, 390, 391, 98 N. W. 138, 139, the court said:

"The next assignment of error relates to rulings said to have been made on the admission of evidence. The evidence was all taken subject to objection, as it should have been, for the case was tried in equity; hence there is no ruling to review.''

In Baadte v. Walgenbach, 185 Iowa 773, 780, 781, 171 N. W. 146, 148, the court said:

"The trial seems to have proceeded after the manner and practice which have become usual in equity cases in this jurisdiction: that is, while counsel on either side exercised to the limit their right to make all conceivable objections to each item of evidence, and their objections were duly noted in the record, the court did not rule thereon at the time, nor were such rulings demanded or entered at the close of the trial.''

This is the practice followed in the federal courts, and in other jurisdictions generally. 30 C. J. S., Equity, section 457; Rule 43(c) of Federal Rules of Civil Procedure, 28 U. S. C., section 723c; Unkle v. Wills, 8 Cir., Okla., 281 F. 29, 34. The purpose is to preserve a complete record of the evidence for the trial and the appellate courts, leaving to them the rejection

of inadmissible testimony in deciding the issues. In the review de novo the appellate court, if it finds the trial court has erred, may then decide the case on the record made without a remand.

Plaintiff does not ask that the cause be sent back for a retrial. Nor should she be put to that delay and expense. Some of her testimony was admitted and later stricken, but much of it went in by offer of proof. Since the defendants insisted that this procedure be followed, and the court improperly acceded to the demand, the testimony introduced by plaintiff and the testimony in the record by offer of proof will be considered as the record of her evidence.

The defendants are not entitled to a remand for new trial. Peoples Nat. Bk. v. Russel, 196 Iowa 401, 406, 407, 194 N. W. 247.

A careful study of the record convinces the court that the equities are all with the plaintiff and appeal strongly in her favor. As said by Justice Evans, in Garman v. Wettengel, 199 Iowa 1150, 1151, 1155, 203 N. W. 266, 268:

"Needless, perhaps, to say that the substantial equity, or want thereof, which supports the claim of plaintiff is always an influential consideration., * * * The equities behind the plaintiff's claim are strong enough to warrant their acceptance as corroboration of the direct testimony in the record, in support of such claim."

It is our conclusion that the alleged prenuptial contract should be set aside and held of no force and effect, and that the plaintiff is entitled to and should be awarded her full distributive share under the statutes of Iowa, as the widow of the deceased, James O'Dell, as of the date of his death. The decree of the district court is therefore reversed, except as to the disallowance of the widow's allowance and the taxing of costs, and the cause is remanded with directions to tax all costs to the defendants and to enter judgment and decree in conformity herewith.—Reversed and remanded.

WENNERSTRUM, C. J., and GARFIELD, HAYS, and OLIVER, JJ., concur.

SMITH, HALE, MULRONEY, and MANTZ, JJ., dissent.

SMITH, J. (dissenting)—I. It is manifestly impracticable to consider in detail all the matters contained in the majority opinion. Nor would any useful purpose be served by so doing. I concur in Divisions VIII and IX and, while favoring an affirmance, I agree that whatever decision we make should not bar any appropriate remedy otherwise available to plaintiff for seeking a widow's allowance.

Division I of the majority opinion briefly sketches the testimony bearing on plaintiff's contention that the "prenuptial" contract was in fact executed after the marriage was consummated. Of course, this becomes entirely unnecessary in view of Division VII. It would be inadequate, however, if that question were to be passed on by us. An analysis of the testimony would, I think, abundantly sustain the trial court's conclusion that the preponderance on that issue was in favor of defendants.

II. With the majority conclusion that the evidence is sufficient "in quality and quantity" to show revocation or modification of the antenuptial contract I cannot agree. Plaintiff's burden at this point is heavy. She relies and must rely on establishing the contents of a lost instrument by parol evidence. The rule in such case is variously stated but all concede the showing must be strong.

"* * * the evidence must be clear and positive and of such a character as to leave no reasonable doubt as to terms and conditions of the instrument." 34 Am. Jur., Lost Papers and Records, section 62.

See, also, 38 C. J., Lost Instruments, sections 71, 74; Bohnert v. Radke, 189 Wis. 203, 207 N. W. 284; Murray v. Guarantee Tr. & Sav. Bk., 79 Cal. App. 69, 248 P. 1039, 1041; Bates v. Bates, 247 Ala. 337, 24 So. 2d 440; Farber v. Plainfield Tr. Co., 136 N. J. Eq. 183, 41 A. 2d 26; Pearson v. McCallum, 26 Tenn. App. 413, 173 S. W. 2d 150, 158.

III. What is the record here which the majority says is sufficient in quality and quantity to show revocation or modification of the antenuptial contract? For the purpose of this inquiry I shall concede the competency of plaintiff (under the "dead man statute") as to all the testimony given by her. Any part

that concerned a transaction or communication between her and decedent is perhaps negligible so far as concerns this issue.

Her testimony may be summarized as follows: Decedent kept the original antenuptial contract with other papers in a tin box on the top pantry shelf at home; his son Wayne and wife lived there with decedent and plaintiff; one day in October 1940, plaintiff and Wayne's wife had an argument over what would be the proper division of the proceeds from the sale of some hogs; Wayne came in and struck plaintiff, who ran to the porch where decedent sat in his wheel chair; Wayne followed and he and his father quarreled and decedent struck Wayne with a cane; decedent called for his tin box but was unable to find the contract therein; he accused Wayne of taking it, which accusation Wayne denied and cursed his father; decedent wanted Wayne to take him to Kellerton and announced his purpose of drawing another agreement so plaintiff would get "her widow's share" and so "the kids couldn't beat her out of it." (Whether this sudden decision was due to anger at Wayne or to the apparent loss of the contract—or both—is immaterial.)

Plaintiff testified Wayne at first refused but later that afternoon did take plaintiff and decedent to town. They went to Burger's store and Wayne, at decedent's request, went out and brought Mr. Turner to the store. Turner was the man who had drawn the antenuptial contract some thirteen years before. Decedent told Turner he wanted a paper drawn so plaintiff could have her widow's share and "the boys couldn't take it away from her"—that the other had been destroyed or lost. Turner went out and later returned with a paper, which he read to them and which they signed. Decedent, according to plaintiff, put this paper in his pocket and on returning to the house placed it back in the same tin box. She said she never thereafter removed it, nor did anyone else in her presence, and that the box was at all times kept on the pantry shelf and decedent, because of his physical condition, could not have gotten it without assistance. Decedent's son Albert was later appointed decedent's guardian and took possession of the box and the key. This is the substance of plaintiff's whole testimony on the subject.

No search for the paper after decedent's death is shown and no demand for its production was made as a foundation for secondary evidence. That question, however, seems never to have been raised. Nor does the record show where and by whom the original "prenuptial" contract was produced after decedent's death. Plaintiff's petition sets it out verbatim and its continued existence seems to be assumed. Its execution is admitted in the answer.

Mr. Turner was plaintiff's witness. His memory of the later transaction is vague. There is implied criticism of him as being more friendly to the defense than to plaintiff because he remembers the earlier transaction better. Such insinuation is unjust. The phenomenon of an elderly witness being able to recall earlier events more clearly than more recent ones should not be the occasion for either suspicion or criticism.

His testimony surely throws no light on the contents of the lost instrument: "I thought then he hadn't kicked her out. She was to get a fair settlement." And again: "I remember at the time * * * I thought Mr. O'Dell was providing for this woman, but just how or what the things were that he was providing, I just don't remember."

The only other scrap of testimony about the lost document is that of plaintiff's daughter. She said that on one occasion decedent sent for her and wanted her to take him to Mount Ayr: "He was not satisfied with the situation on the place and he wanted to change his will." She was unable to accommodate him on that occasion but testified that two or three weeks later he told her "he had gone to Kellerton and had this paper drawn up so she [plaintiff] could hold her widow's share in the estate." She testified that on one of these occasions "he said that this first paper that was drawn up had disappeared and was destroyed or stolen, and he wasn't satisfied with that, that he was going to have a different paper made." She is manifestly confused in this last statement if plaintiff was right in saying they went and had the new agreement drawn the same day he missed the original contract from the box.

I have set out in substance the entire record bearing on the *contents* of the lost instrument. No person testified who ever

read it except Mr. Turner, who had no recollection of its contents except the conclusion that decedent was providing something for his wife, "but just how or what the things were * * * I just don't remember."

Plaintiff heard it read but did not testify as to its contents. Plaintiff's daughter never saw the document and merely testified to declarations of decedent made before and after it was drawn purporting to state its purpose and legal effect. The plaintiff's testimony in effect says no more than that decedent told Turner the object he wanted to accomplish, viz., to fix it so plaintiff could have her "widow's share." Whether the paper as thereafter drawn was sufficient for the purpose is, of course, a matter of legal conclusion and there is nothing shown upon which to base a conclusion.

Unquestionably some document was drawn and signed, but there is absolutely no showing of its contents—only testimony as to what was desired or directed to be done and vague declarations of decedent constituting his legal conclusion as to its contents. Such proof does not meet the requirement where a lost instrument is relied on. We are left to speculate upon what decedent meant by "widow's share" and whether it was to be in addition to or in lieu of the provision made for her in the original "prenuptial" agreement. What Turner understood was meant and what he put into the new contract is entirely undisclosed.

IV. In In re Estate of Thorman, 162 Iowa 237, 239, 144 N. W. 7, 8, Ann. Cas. 1916B, 484, this court said:

"To establish a lost will or prove its contents, the evidence must be of a very clear and satisfactory character." In that case the alleged lost instrument was sought to be established by objectors seeking to prevent the probate of an earlier will. The opinion continues: "*Something more than the declarations of the testator is essential to accomplish this.* In re Will of Dunahugh, 130 Iowa, 692; In re Will of Brown, supra [143 Iowa 649, 120 N. W. 667]." (Italics supplied.)

In the cited Brown case, 143 Iowa 649, 660, 661, 120 N. W. 667, 671, it was said, concerning declarations of a decedent:

"They were proper evidence of the mental condition of the testator and of his intention and understanding of the nature of the instrument which he was executing. *They were not evidence of the contents of the will.* In re Will of Dunahugh, supra. Whether the instrument was a will was a question to be determined from the contents. The declarations of the testator were evidence that the testator *believed* the instrument to be a will and that he *intended* it as such. Notwithstanding such belief, its provisions might as a matter of law fall short of constituting a will. The belief of the testator that the instrument was a will would not constitute it such. In a legal sense, therefore, his declaration of such belief would not be evidence that it was such." (Italics supplied.)

The rule as to the burden of proof of contents of lost or destroyed instruments is, of course, not confined to cases involving wills. A leading case was the decision in Tayloe v. Riggs, 1 Pet. (U. S.) 591, 600, 7 L. Ed. 275, 279. It involved an alleged contract for sale of corporate stock. Chief Justice Marshall said:

"When a written contract is to be proved, not by itself, but by parol testimony, no vague uncertain recollection concerning its stipulations ought to supply the place of the written instrument itself. The substance of the agreement ought to be proved satisfactorily; and if that cannot be done, the party is in the condition of every other suitor in court who makes a claim which he cannot support. When parties reduce their contract to writing, the obligations and rights of each are described, and limited by the instrument itself. The safety which is expected from them, would be much impaired, if they could be established upon uncertain and vague impressions made by a conversation antecedent to the reduction of the agreement."

The rule has been recognized in our court as being applicable in an action to recover on a destroyed promissory note. McDonald v. Jackson, 56 Iowa 643, 10 N. W. 223. And in case of a lost partnership agreement. Stewart v. Todd, 190 Iowa 283, 293, 294, 296, 298, 173 N. W. 619, 180 N. W. 146, 20 A. L. R. 1272.

The Supreme Court of Pennsylvania announced the doctrine in an early case in which a destroyed "marriage contract".was attempted to be established to defeat the widow's right of dower. The court said:

"\* \* \* the rule is, that the contents of a lost paper must be so proved as that the court can say, with something approximating to certainty, what it contains." And again: "\* \* \* it may be added, that chancery will not decree specific performance, *without proof of the whole contents of the instrument. Evidence of part will not suffice,* and particularly a marriage contract, where the words used by the parties \* \* \* are so important as regards the rights of the feme." In re Gangwere's Estate, 14 Pa. 417, 426, 427, 53 Am. Dec. 554, 557, 558. (Italics supplied.)

In Scurry v. City of Seattle, 56 Wash. 1, 2, 104 P. 1129, 1130, 134 Am. St. Rep. 1092, the Washington Supreme Court said:

"To prove the contents of the lost instrument, there was only one witness, the husband of one of the appellants, and his memory of the language in which the agreement was stated, although he testified that he prepared it himself, was so indistinct as scarcely to rise to dignity of proof. While he stated with clearness his *understanding* of the *legal effect* of the instrument, he did not relate even the substance of the contents of the writing itself. In order to establish a lost instrument on behalf of a party asserting rights under it, the evidence must be clear and positive, and of such a character as to leave no reasonable doubt as to terms and conditions of the instrument. It is not enough that it be established that an instrument containing some form of limitation at some time existed, *nor is it enough that some witness is able to state his understanding of the legal effect of the instrument;* the contents of the instrument must be substantially proven, and with such clearness that the court can determine its legal effect from the language used therein." (Italics supplied.)

The majority find that decedent "revoked or modified the prenuptial agreement." But they do not say *which*. The reason is clear: No one, from this record, even if decedent's own legal conclusions were to be accepted, can say whether it was intended to give plaintiff her so-called "widow's share" *in addition to or in lieu of* the provision made for her in the antenuptial contract. The case is to be reversed and remanded. What is the trial court to do in this respect? There is no way to determine except *arbitrarily* to say whether the original contract was *revoked* or *modified*.

V. There is no contention that the prenuptial agreement was unfair. There is nothing here to show the comparative situation of the parties. Their ages are not shown or the extent of their respective holdings. It is doubtless true that because of decedent's long illness a greater burden fell on plaintiff than would otherwise have been the case. That she carried it competently and in wifely fashion might well have suggested to decedent the propriety of a more liberal arrangement.

But this does not help us here where there is no adequate or competent showing as to what decedent actually did. He might have accomplished his purpose by will. Unfortunately, perhaps, he chose the more doubtful method by contract. Under our decision in Fisher v. Koontz, 110 Iowa 498, 502, 80 N. W. 551, a postnuptial contract of this kind is possible if based upon a good consideration. See, also, 41 C. J. S., Husband and Wife, sections 93, 109; In re Kesler's Estate, 143 Pa. 386, 22 A. 892, 13 L. R. A. 581, 24 Am. St. Rep. 557; 30 C. J., Husband and Wife, section 224; 41 C. J. S., Husband and Wife, section 110.

If by the postnuptial contract alleged here there was some reciprocal contingent provision in decedent's favor, that would probably be sufficient consideration. Possibly we should, in an appropriate case, hold that the parties might join in a voluntary modification or abandonment of the contract, since it was still executory. But if we are to do this it should be in a case in which we know what the postnuptial transaction actually was.

I have attempted to set out only the essential facts of the

474

record. Plaintiff doubtless has been a faithful wife and merited whatever recognition decedent wished to extend her. But our duty here is to follow the law, uninfluenced by considerations calculated to arouse sympathy in the instant case. That must be my justification for this dissent. If it were merely a question of personal preference I would be glad to consent to a decision in plaintiff's favor.

However, for the considerations stated I would affirm the decision of the trial court.

HALE, MULRONEY, and MANTZ, JJ., join in this dissent.