# IN THE COURT OF APPEALS OF IOWA

No. 20-0418
Filed November 30, 2020

IN RE THE MARRIAGE OF ASHLEE ANN DEMOSS
AND KEITH ALLEN DEMOSS

Upon the Petition of
ASHLEE ANN DEMOSS,
　　　　Petitioner-Appellee,

And Concerning
KEITH ALLEN DEMOSS,
　　　　Respondent-Appellant.

_____

　　　　Appeal from the Iowa District Court for Jackson County, Mark J. Smith,

Judge.

　　　　A former husband appeals the child custody provisions of the decree

dissolving his marriage. **AFFIRMED.**

　　　　Jamie A. Splinter of Splinter Law Office, Dubuque, for appellant.

　　　　Susan M. Hess of Hammer Law Office, PLC, Dubuque, for appellee.

　　　　Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

Keith DeMoss appeals the decree awarding Ashlee Hingtgen[1] physical care of their two sons, who were ages five and two at the time of the dissolution trial. Keith contends it is in the children's best interests for him to have physical care, or at least joint physical care, claiming Ashlee is unable to support his relationship with the children. In contesting the physical-care award to Ashlee, Keith claims the district court improperly admitted her journal into evidence against hearsay rules. Keith also asks for a modification of child support to coincide with any change in physical care. Both parties ask for appellate attorney fees.

Finding no merit in Keith's claims, we affirm the decree. But we decline to award Ashlee attorney fees on appeal.

## I. Facts and Prior Proceedings

After years of living together, Keith and Ashlee married in June 2016. They had two sons, J.D. born in 2014, and K.D. born in 2017. A few years into the marriage, the parties separated.

Keith and Ashlee clashed over household spending and work commitments. Keith held several side jobs on top of his full-time employment as a bus mechanic for the school district. During the school year, he spent extra hours as a part-time janitor. In the fall and spring seasons, he worked at Innovative Ag Services helping farmers with fieldwork. Come winter time, he engaged in a snow-plowing business for the community. On top of that, Keith volunteered as a fire chief and

---

[1] In the dissolution decree, the district court granted Ashlee's request to return to her maiden name.

served as a member of the Maquoketa City Council. Besides work, Keith "spent a lot of time with his friends" socializing, according to Ashlee.

Ashlee has been a full-time registered nurse at Medical Associates in Maquoketa for the past six years. During the workweek, K.D. stayed with Ashlee's mother for daycare, and J.D. went to a nearby preschool. Because Keith often worked late nights, Ashlee picked up the boys by 4:00 p.m. to 5:00 p.m. every day.

Given the parents' respective schedules, Ashlee was the primary caretaker up until the separation. She prepared meals for the boys, took care of their night-time routine, and scheduled their medical appointments. Keith sometimes helped out with chores but was mainly responsible for work outside the home. Ashlee managed the family's personal finances and paid the bills.

Ashlee and Keith had a "volatile" relationship. They had frequent flare-ups in front of the children. When the situation escalated, Ashlee moved out. The fights were never physical—though one time, Keith threw Ashlee's phone and broke it. A few months before their separation, Ashlee learned Keith was having an affair. That indiscretion led to him losing his job with the school. Since then, Keith has worked as a full-time mechanic at C & R Tire in Maquoketa. He no longer does seasonal work.

Unable to reconcile their differences, Ashlee filed for divorce in February 2019. At a temporary custody hearing in June, the district court granted physical care to Ashlee and set visitation for Keith that included: "Every other weekend starting on Friday . . . and ending on Sundays at 7:00 p.m."; one day a week for two hours; and some holidays. The court found joint physical care unworkable

because the parties lacked "quality communication." Noting Ashlee was the past primary caregiver, the court declined "to disturb the status quo."

From then, Ashlee strictly abided by the court-ordered schedule. For example, Keith asked: "Could I have the boys all day Thursday?" Ashlee replied, "No. Please follow the court order." If Keith asked to take J.D. to school in the mornings, Ashlee refused because she preferred J.D. to take the bus instead. She even declined Keith's request for the boys to spend an extra night with him on Father's Day. Ashlee believed it was "best to keep the boys' daily routine the same." After the court order, Ashlee's family members became more hostile toward Keith. One time, her brother verbally threatened Keith in front of the children when Keith came to pick them up for visitation. He did not want Keith coming up to the door.

At Ashlee's insistence, the parties communicated solely through text messages. Keith believed her strategy of using truncated exchanges was aimed to restrict his involvement in parenting decisions such as doctor's appointments and extracurricular activities. In late June, Ashlee placed J.D. in therapy. She informed Keith by text saying, "FYI, I have J.D. seeing a therapist over the summer. Starts this Tuesday. Just want to stay ahead of things." Keith testified he supported therapy but was upset that Ashlee made the decision on her own. The therapist diagnosed J.D. with adjustment disorder stemming from "the separation of his parents and them living in two different houses."

The district court held a two-day trial in February 2020. Ashlee offered as an exhibit her daily journal to establish the timeline for certain events or conversations with Keith. Subject to opposing counsel's hearsay objection, the

court admitted the journal into evidence.  At trial, Keith sought joint physical care and no child support.  But pointing to the unresolved hostility between the parties, the court found "joint physical custody [was] not in the best interests of the children."  Instead, the court granted the parties joint legal custody, confirmed its prior physical care decision in favor of Ashlee, and expanded visitation for Keith. The court also ordered Keith to pay $737 in monthly child support, plus $176 in cash medical support.  Keith now appeals.

## II.  Scope and Standards of Review

Our review of dissolution-of-marriage cases is de novo.  Iowa R. App. P. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018).  We give weight to the fact findings of the district court, especially when considering witness credibility, but they do not bind us.  *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006).  Because the court tries dissolution cases in equity, it may allow evidence into the record subject to hearsay objections.  *See In re Marriage of Anderson*, 509 N.W.2d 138, 142 (Iowa Ct. App. 1993).  We review that evidence for correction of legal error.  *See Garland v. Branstad*, 648 N.W.2d 65, 69 (Iowa 2002).  If the exhibit was inadmissible, we may decide the case on the remaining record without remand.  *See O'Dell v. O'Dell*, 26 N.W.2d 401, 417 (Iowa 1947).

## III. Analysis

### A.  Admission of Ashlee's Journal

Keith challenges the district court's admission of Ashlee's journal into evidence at the trial, contending the entries were hearsay.  According to Keith, "[i]t is completely unfair to allow Ashlee to take notes on the lives of the parties and get

all that 'extra' evidence into the record, when it is not possible during a [two]-day trial for [him] to refute every page."

Contrary to Keith's claim, the court's admission of the journal subject to objection did not prejudice his case. In fact, the court followed the accepted course. *See In re Marriage of Thompson*, No. 10-0056, 2011 WL 441698, at *2 (Iowa Ct. App. Feb. 9, 2011) (citing *Hughes A. Bagley, Inc. v. Bagley*, 463 N.W.2d 423, 426 (Iowa Ct. App. 1990) (explaining "trial court should ordinarily not rule on objections to testimony" to allow full de novo appellate review of the record)). We recognize a court in equity must consider the hearsay rules before admitting evidence. *See* Iowa R. Evid. 5.1101; *see also In re Marriage of Williams*, 303 N.W.2d 160, 163 (Iowa 1981) (clarifying dissolution cases under Iowa Code chapter 598 have "no provision relaxing the hearsay rules of evidence"). But if the court does admit hearsay evidence after a party makes a proper objection, the remedy is for the court to disregard that evidence in its decision. *See Williams*, 303 N.W.2d at 163.

Hearsay is a statement that was not made "while testifying at the current trial or hearing" and is offered "into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(c). As a general rule, hearsay is inadmissible. *State v. Veverka*, 938 N.W.2d 197, 199 (Iowa 2020); *see* Iowa R. Evid. 5.802. We agree that Keith's hearsay objection was valid. Ashlee offered her own out-of-court statements to prove certain events took place during the marriage and separation, meeting the hearsay definition. But the district court did not impermissibly rely on the hearsay. The court gave no weight to the entries in its findings. In fact, the court never mentions the journal in its decree. Instead, the

court cited facts separately established by witness testimony and other exhibits. Having found Ashlee's journal inadmissible, we likewise do not consider it in our de novo review. *See Anderson*, 509 N.W.2d at 142.

### B. Physical Care

Keith contends the district court wrongly granted physical care to Ashlee because of its "bias against joint physical care." In his view, joint physical care would be "ultimately best for the boys." Alternatively, Keith argues the court should have granted him physical care upon its rejection of joint physical care.

We begin with Keith's first claim—that the district court should have granted the parties joint physical care.[2] After hearing from various witnesses, the district court rejected joint physical care based on the "large amount of hostility" between the parties. Even after their separation, the parties continued to argue. The court believed J.D.'s adjustment disorder was in "no doubt based on the conflict he [saw] between his parents." Given the parties' animosity and Ashlee's past and present role as the primary caregiver, the court determined a shared arrangement "would be unduly disruptive" to the children. The record justifies the court's determination.

In deciding whether joint physical care is appropriate, we use the best-interests framework. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Under that framework, we consider four non-exclusive factors: (1) stability,

---

[2] Under Iowa Code section 598.1(4) (2019),

> "Joint physical care" means an award of physical care of a minor child to both joint legal custodial parents under which both parents have rights and responsibilities toward the child including but not limited to shared parenting time with the child, maintaining homes for the child, providing routine care for the child and under which neither parent has physical care rights superior to those of the other parent.

continuity, and approximation of caregiving; (2) the parties' ability to communicate and show mutual respect; (3) the degree of conflict between the parties; and (4) how much the parties agree on daily matters. *Id.* at 697–99.

On our de novo review of the record, we find joint physical care would not be in the children's best interests. First, Ashlee has historically been the hands-on parent and continues in that role. *See id.* at 698. ("[W]here one spouse has been the primary caregiver, the likelihood that joint physical care may be disruptive on the emotional development of the children increases."). Although Keith has more time now, during their marriage, he spent long hours away from home because of various work commitments. True, the temporary order did give Ashlee physical care of the boys, making it harder for Keith to take an equal caregiving role. But we give weight to the caretaking history before the parties separated. *See id.* at 696–97. The approximation factor weighs against joint physical care.

Second, the parties struggle to communicate civilly and do not show mutual respect. Keith and Ashlee have a concerning history of verbal aggression. A neighbor recalled hearing them shout and seeing Ashlee "storming up the street." The parties agreed they had major trust issues in their relationship. This factor also weighs against joint physical care. *See id.* at 698 ("A lack of trust poses a significant impediment to effective co-parenting.").

The third factor carries the most weight here. *See id.* (emphasizing "a stormy marriage and divorce presents a significant risk factor" to joint physical care). By all accounts, the parties had a highly conflicted relationship. Although one party cannot have "absolute veto power over whether the court grants joint physical custody," we give some weight to Ashlee's objection to shared care. *See*

*id.* (explaining court can consider a "lack of mutual acceptance" because it "can be an indicator of instability in the relationship"). After observing the parties in person, the district court believed their hostility interfered with their ability to prioritize the needs of their children. We defer to the court's findings on this point. *See McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa 2010) (noting district court has advantage of listening to witnesses and making first-hand observations on their demeanor).

As for the fourth factor, Keith acknowledges the "parties are very alike in their parenting styles." Although the parties have some differing views on discipline and night-time routines, they seem to agree on most daily child-rearing matters. Keith even testified he had an issue with the lack of communication but ultimately supported Ashlee's decisions. But all things considered, we cannot ignore the significant emotional risk to the children if the parties are unable to set aside their differences under a shared-care arrangement. For these reasons, we conclude joint physical care is inappropriate.

We next turn to Keith's claim that the court should have granted him physical care of the children.[3] In deciding which parent should exercise physical care, we look to the factors in Iowa Code section 598.41(3) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). Section 598.41(3) focuses on "the importance of the child[ren]'s physical and emotional contacts with both parents." *In re Marriage of Wedemeyer*, 475 N.W.2d 657, 659 (Iowa Ct. App. 1991). One of those statutory factors requires the court to consider which parent can better

---

[3] "When joint physical care is not warranted, the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights." *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007) (citing Iowa Code § 598.41(1)(a), (5)).

support the other parent's relationship with the children. *Id.* (citing Iowa Code § 598.41(3)(e)). We view these factors in light of the best interests of the children. Iowa Code § 598.41(1)(a).

Keith points to Ashlee's conduct after she moved out in June 2019, claiming she prevented him from spending "maximum time" with the children.[4] Finding some truth in his allegation, the district court noted:

> Ashlee has strictly followed the court's schedule and has refused to be flexible. This includes refusing to allow Keith to continue into the weekend on Father's Day, even though there was only a few hours between the end of the Father's Day visit and the beginning of the weekend visit. The court finds that her conduct in this regard is unreasonable and not in the best interests of the children. Although Ashlee did follow the court order, the court would indicate that flexibility and accommodation is key to having the children have a good relationship with both mother and father.

Based on that assessment, Keith contends the court should not have awarded Ashlee physical care. He asserts: "She has been unable to put aside her differences with Keith and her hurt over his affair, to put the children's needs ahead of her own." He claims her past behavior indicates she will not foster his future relationship with the boys.

We agree it would have been in the children's best interests for Ashlee to show more flexibility in implementing the temporary visitation schedule. But the record does not show that her refusal to deviate from the court order signals an unwillingness to support Keith's ongoing relationship with the children. A review of the text messages reveals Ashlee prioritized the boys' daily routine. For

---

[4] Iowa Code section 598.41(1)(c) states: "The court shall consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement."

example, she asked Keith to have the boys sleep in their own beds during visits because they would have trouble sleeping when they came back to her home. Given J.D.'s adjustment disorder, a consistent routine is important. Like the district court, we are reluctant to disturb the boys' stable situation.

We also cannot conclude that Keith is more likely to promote a supportive relationship. The record shows that both Keith and Ashlee are capable and loving parents. But both contribute to the lack of cooperative parenting. All the witnesses testified that the parties' hostility and lack of communication began long before their separation. The fact that Keith and Ashlee continue to blame each other for their parental shortcomings reflects their inability to consider what is best for the children. We agree with the court that "[the parents] are putting their own needs above those of the children when they argue over visitation, and thereby undermine their own relationship with the children, as well as burdening the children with the guilt."

Still, on appeal, Keith complains, "[i]f the mother is the problem, she should not be granted physical care." That complaint ignores the primary purpose of this litigation. We do not make a physical care determination based on the "perceived fairness" to the parents, but what is in the best interests of the children. *Hansen*, 733 N.W.2d at 695. We give significant weight to "the factors of continuity, stability, and approximation." *Id.* at 700. And those factors weigh in favor of Ashlee.

We thus decline to overrule the court's determination on this record. *See In re Marriage of Zimmerman*, No. 18-0812, 2019 WL 3331251, at *2 (Iowa Ct. App. July 24, 2019) ("At the end of the day, the district court's ability to assess the parents' demeanor carries greater weight in this type of close case because the

court's unique vantage point is not available to us." (citations omitted)).  We affirm the district court decision granting Ashlee physical care and liberal visitation for Keith.  Likewise, we uphold Keith's child-support obligation.

## IV. Appellate Attorney Fees

Both parties ask for appellate attorney fees.  "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion."  *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013).  In determining whether to award attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request needed to defend the district court's decision on appeal.  *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007).  Although Ashlee prevailed on appeal, Keith does not have a greater ability to pay.  Thus we decline to award appellate attorney fees to either party.  We assess the cost of the appeal to Keith.

**AFFIRMED.**